Good morning, Your Honors, and may it please the Court. Shira Siegel on behalf of Appellant, the Warden. I'd like to save three minutes for rebuttal, please. The District Court in this case erroneously found two of the California Court of Appeal's factual findings unreasonable. First, contrary to the District Court's opinion, the California Court of Appeal reasonably determined that trial counsel had a tactical basis for electing not to object to Wilberger's unsworn testimony. Wilberger was giving favorable recanting information, which was helpful to Petitioner's defense of mistaken identity. When Wilberger first refused to be sworn, additionally because of the colloquy between the trial court and Wilberger, the California Court of Appeal reasonably found that a timely objection would have resulted in the re-administration of the oath and Wilberger ultimately taking the oath. There are two tactical decisions made at that point. It was both trial counsel believed that objection would be futile and that the technical objection would be cured and also that he sort of had a trump card in waiting to see if Wilberger would recant his prior inconsistent statement or if he would testify consistently with his prior inconsistent statement before trial counsel decided if he wanted to move to strike. Yeah, but how about at the very beginning? I mean, the magistrate judge with whom the district judge agrees says, well, the problem is the beginning. After he's made the mistake, he makes tactical judgments. But at the beginning, he fails to object to the introduction of the testimony at all. And as I read the affidavit, he says, well, I thought I did, but if I didn't, that was a mistake. That's the problem with all of this. I mean, he does he says he disclaims any tactical decision at that point. Well, the California Court of Appeal rejected counsel's assertion of error based on the record because counsel didn't argue. It is the affidavit in terms of whether he had a tactical reason. He says, I thought I did it. If I didn't do it, it was a mistake. Right. I respectfully disagree with the fact that he admitted it was a mistake. He objected that he said that he should have objected to preserve the issue for appeal. I respectfully submit that there's a distinction between it was a mistake not to object at the time of trial and I should have objected to preserve it for appeal. Trial counsel executed his declaration 16 days after the California Court of Appeal had found he had waived the objection. So it's not the same. I'll just read the language from the affidavit. Sure. I thought I had objected to any examination of Mr. Wilbarger when he first refused to be sworn. However, if I failed to do so, I believe I should have objected immediately. To preserve it for appeal. Well, yeah. Well, again, I respectfully submit that to preserve it for appeal is a different matter than having a tactical basis at the time of trial for not objecting. I'm just suggesting that under California practice, a court could routinely just call the prosecution, could call a witness. The witness refuses to take an oath and that the court can then go ahead and take the testimony nonetheless? No, I'm not suggesting that that's the appropriate practice in California or anywhere for that matter. What the U.S. Supreme Court has said, though, is that you can waive your Confrontation Clause rights as a strategic decision. And that's exactly what occurred here. Well, okay. We're back to square one, right? Correct. The counsel, clearly that was not the case. Well, trial counsel What happened is they then went into chambers and the court proceeded to go through the colloquy with the witness and determined that, in fact, he knew what he was doing, but he said, we're going to proceed with your testimony. Well, the trial court said, you understand that you have a duty to tell the truth and Wilberger said, yes, I do. And he had nothing to do with whether he had to take an oath or not. He just barely said, do you understand what it is to tell the truth? And he said, yes, I do. And then he says, all right, we're going to proceed with your testimony. The inquiry is a little bit more in-depth than that. Of course, she asked how old he was, if he understood what the truth was. I've got it in front of me. He never swore to tell the truth. He never took the oath. That's true. Although the California Court of Appeal did find that he came close to taking the oath based on the colloquy. Coming close is no good. I understand. I understand that. The California Court of Appeal did not find that he actually took the oath. No one here is contending that he took the oath. He didn't. Correct. He didn't. Everyone is on the same page with that. See, I thought if I'm the defense attorney, and I know what this guy is going to say, he didn't lay a glove on the defendant during his testimony, did he? He... He actually helped the defendant. Yeah, exactly. So I thought the defense attorney was going to say, boy, I saw this is a really fat pitch. The guy is going to help me. Then later on, I'll say, whoa, you can't use the prior statements because he never testified under oath. Well, that's exactly what occurred here. Well, except the defense attorney disclaims that. Well, of course... That's the problem. Sure, but it's established law that a court need not accept a declaration of a counsel that falls on his sword, which... Well, he really didn't fall on his sword all that much. Well, if this court is interpreting the declaration as he has made a mistake, then the California Court of Appeal was entitled to reject that as trial counsel just falling on his sword. My argument is that he didn't actually admit making a mistake, and the record belies any contention that he thought he had objected because he didn't say that to the trial court at the time. So the standard here... Second, the California Court of Appeal reasonably found that Wilberger came close to taking the oath, which informed its conclusion that he ultimately would have taken the oath if trial counsel had timely objected. Let's kind of see where we are on the argument. Assume for a moment that it was a mistake. I understand that's not your argument, but assume for a moment it's a mistake. Now we get to prejudice. Yes. And the Court of Appeal says it was sufficiently likely that if he had been pressed, he would have taken the oath. Where's the evidence for that? The Court of Appeal, there are several places where the Court of Appeal extracted that. First, the colloquy between the trial court and Wilberger. The Court of Appeal recognized his initial no response to the admission of the oath as a flippant response by someone who didn't want to be there, who had been arrested, in order to come to court. And the California Court of Appeal said on direct appeal that it was likely he was playing games with the court. I'm sorry. It was likely he was playing games with the court. Thereafter, the trial court inquired the colloquy that we've discussed, and his demeanor changed. He said, yes, ma'am, answers. Yes, ma'am. Yes, ma'am. I understand. I have a duty to tell the truth. I understand what the truth is. I'm 24 years old. Wait a second. He says you have been told to swear to tell the truth. Do you understand that? Correct. He wasn't asked whether he would swear to tell the truth. He was not. That's correct. The trial court did not frame its inquiry very precisely. The trial court could have said, if you get back on the stand, we are going to ask you again whether you will swear to tell the truth. Absolutely. But the trial court didn't do that. It did not. And the trial court could have then asked the witness to be re-sworn, and the trial court didn't do that. It did not. Instead, the trial court said, you know what the truth is, and we are going to proceed with your testimony. Do you understand that? That's true. And that's precisely what he did. Without swearing him in, they proceed with his testimony. And, again, that conclusion informs why trial counsel may have believed an objection would have been futile, because the trial court had indicated that it was going to proceed with his testimony. Not ever knowing what he was going to say, he could have said, Your Honor, I object to this witness testifying if he does not swear to tell the truth. Sure. But at that moment, as the California Court of Appeal found, based on the colloquy, trial counsel likely almost came close to swearing. Right. And that he ultimately would have taken the oath if an objection had been lodged. I thought quite possibly counsel didn't run the risk that he would take the oath. So he just let the testimony go. It helped him. And then later on he said, Wait a minute, that wasn't sworn, so you can't use these prior statements. That would have been a pretty smart move, but I'm not sure that's what happened. Well, I think that was a smart move, and I think that is what happened here. But he didn't say that was what he said he had. No, he didn't say that. But, again, the California Court of Appeal can reject. It seemed to me that the gamble was really the prosecution's gamble. The prosecution then proceeded to put on evidence that it now seeks to rely on, knowing that the witness was not under oath. And you're not saying that the courts now should start deciding cases of guilt and innocence based upon witnesses coming to court and the prosecution knowingly presenting evidence that is not under oath. You're not saying that. No, not at all. But that would be the effect of a decision by this court saying that it's okay. Well, of course, the prosecutor the next day said that Wilberger had assented to the oath, so I don't think that she was going sort of trying to mislead the court or the jury. I'm sorry, the prosecutor the next day said what? That Wilberger had assented to the oath. And so I think that he had sort of agreed to the oath. And when did he do that? Well, that was her interpretation of the colloquy. So I don't think that she my point is that I don't think that she was trying to do something, you know. I think she was trying to put a gloss on the record that the record wouldn't support. I mean, that could be. Of course, the California Court of Appeal agreed with her. That's the problem. That's what the magistrate said, hey, wait a minute. The trial judge said, the district court said, we just can't do that. There are two possible ways to go at prejudice here. One of them is the way that the two justices on the California Court of Appeal did, which is to say, well, he would have, if pressed, sworn, and that would have taken care of the problem. Assuming that we don't agree with that and that we so strongly disagree that it goes without this testimony, there's another possible ground to get on the issue, and that is that the evidence against him is sufficiently strong without this testimony. And the only California judge we have speaking to that question is the dissenter, who says, in my view, it's not. Correct. Now, are you arguing that the other evidence is sufficiently strong? Well, I have two responses to that. The first is that the California Court of Appeal also found, in relation to prejudice, that Will – that Petitioner had failed to satisfy his burden under Strickland in proving that Wilberger would have taken – would or would not have taken the oath. To the very extent that he would or would not have taken the oath and it's speculative to go either way, Petitioner failed to meet his burden under Strickland. Right. With respect to – But my question is not – but my question is not that. My question is the next one. Correct. What about the prejudice argument that, listen, there was enough evidence to convict even without Mr. Wilberger's testimony and, therefore, the admitting that non-sworn testimony is okay – is insufficiently harmful that we can't get past the prejudice prong on Strickland? I do think that there was a mountain of evidence to support that. So tell me what that evidence is. Sure. So Williams – Williams said that Petitioner moved her out of the way immediately before the shooting. She also said that Petitioner had a stash box in his car which contained a gun. Right. In addition – Now, a gun was recovered from him afterwards. Yes. And that gun matched none of the cartridge or shells found at the scene. Is that right? Yes. That's correct. So the fact that he might have had a gun in the stash box as proof that he is the shooter is a little bit undermined by that. Well, the ballistics evidence also supported that Petitioner was the shooter. In this respect, all of the bullets went into the front of the car. That's what the ballistics expert said based on the trajectory. Williams placed Petitioner at the front and to the right of the car. That's exactly how the bullets entered the car. And in addition, the casings found in the area that Williams identified Petitioner was standing in that night, those were 9mm. The bullet pulled from the victim was also 9mm. All of the other casings that were found were in a place on the side of the car and there were no impact marks on the side of the car. There's one problem with the whole harmless error analysis is that under Katiakis, the court has said that structural error is not subject to harmless error correction. And it seems to me that this almost sort of tell-the-truth argument fails because of the fact that this little colloquy was not in front of the jury. It was not. It was not in front of chambers. So as far as the jury knew, the witness had been called to the stand. He was asked if he would swear to tell the truth. Raise your right hand. Do you swear to tell the truth? No. That's what the jury heard. Then the witness comes back and he now proceeds to testify without having sworn to tell the truth in front of the jury. Surely that has to be structural error. I don't think that is structural error under California law. Okay. So then you are telling me that under California law, witnesses can be called to the stand and can say openly that they will not tell the truth and be allowed to testify, and that that does not shock the public perception of justice in California? I don't mean to suggest that. I find that hard to believe. I see my time. No, it's okay. We can keep talking. I don't mean to suggest that at all. What I mean to suggest is that an objection can be waived, and in this case it was waived. So it's not under California law that unsworn testimony is just admissible. It's that an objection must be lodged, and it was in this case waived. That seems to me to be even more shocking a proposition. You know, the way this case works is kind of peculiar because he says, I won't swear to tell the truth. Then the prosecutor questions him, and the prosecutor doesn't want the jury to believe that he's telling the truth because what the prosecutor wants is the impeaching evidence that comes in. So the prosecutor wants the jury to think that he's lying as he got up there testifying. So, hey, this worked perfectly for the prosecutor. No, I'm not going to swear to tell the truth. Then he gets up there and he lies. This is the prosecutor's theory. He lies through his teeth because I can't remember a darn thing, and then finally the prosecutor gets to come in with these prior statements. That's a pretty good deal. Well, again, I don't think that there was any ill intent on the part of the prosecutor. No, no. But that's kind of how it works. Well, you know, that is how it worked, but that's because trial counsel made a tactical decision not to object. Maybe. Okay. Why don't we hear from the other side, and we'll give you a chance to respond. Good morning, Your Honor. Marilee Marshall on behalf of Prentiss Griffin, the Petitioner and Appellant Appellee. I don't know where the Court would like me to begin. I had a couple of points I was going to make. I don't think that counsel, let's even assume, for argument's sake, that counsel wasn't going to object because the guy was going to ramble on and say things that were fairly helpful to the defense. Counsel's big mistake wasn't beginning to cross-examine him. It was when he cross-examined him that he waived the right to confrontation and the real center of his ineffective assistance developed. Because if he had said nothing and then he could have later objected to the test only being considered and the tape coming in, but as it was, he opened the door by cross-examining him about two things he didn't need to say. He'd already said, you know, that no, I don't remember anything. No, I've never seen this person before. And then counsel asked him the same questions. It's obvious that he's telling the truth, that he just made a mistake. He just really made a mistake. He was telling the truth, counsel or the witness? Counsel. It sounds to me like my cousin Vinnie sort of tried. And then as far as, you know, his asking those two questions at least was based upon ignorance of the law. And the district court said it a lot better than I can say it. But another point is that the following the notion that somehow this guy was close to telling the truth and that should count, it's even if we were going to accept that, it's not borne out by the record. Because the next day, the prosecutor said, you know, well, I could bring him back and the court said, well, I'm not going to bring him back unless I think he's going to take the oath. Can you assure me he'll take the oath? And the prosecutor didn't make any assurances, representations, one way that he would take the oath if he was brought back. So. Well, the judge said, I mean, what the judge said at that point is not, it's a little bit ambiguous because, on the point that needs to be proven, and that is the judge said, I'm not going to bring him back unless you know he is going to take the oath. And the prosecutor didn't bring him back. Now, no is different from probable and so on. Well, he was in custody. The prosecutor could have asked him, you know, and said, you know, are you finished acting out? Are you going to come in there and take the oath and repeat your testimony under oath? But he didn't do that. So I believe the prosecutor probably had a good faith belief that he wasn't going to take the oath. There was nothing he said that made anyone think he might be more than kind to take the oath the next day. He was obviously pretty defiant. I really would like to mention, I would love the Court to find its structural error, well, error at all, but structural error particularly. Did you argue it? No, I did not specifically argue it. I mean, we usually throw that in. But it's such a great Chapman standard that, I mean, I don't think it really matters. You usually throw it in. There's no other evidence, really, that he's the shooter. Williams was running to the car when the shots rang out. She didn't see the shooter. All she saw was a whole line of cars. There were lots of people there from Grape Street. And my client waved her out of the way. At worst, that means that my client might have known that it was dangerous for her to be there. He knew her from the neighborhood. Well, it looks as though it's a cooperative shooting. That is to say, we've got shooting from several directions all at once. So the inference is pretty strong that something was about to happen, whether he himself was the shooter or not. I would have to say that. But I don't necessarily know that he was an aider. He wasn't tried as an aider and a better. The jury never saw found. Do we know if he was right-handed or left-handed? No, I do not. And there's nothing in the record that tells us that? I think there's not. But I could be wrong. I don't know. The reason I ask that is that she says in the testimony that comes in, because what she said to the police, that he was waving her away with his right hand and it was his left hand that she couldn't see. She did say that, but that doesn't necessarily mean you could wave with either hand. Well, that's right. If he was right-handed, that would suggest to me that, well, he probably is not holding a gun in his left hand because he's going to want to be shooting with his dominant hand. But we don't know that. Okay. Well, as the court said, the district court said, and I believe the defense said, too, that no jury was likely to find him guilty of being the shooter based upon, without the testimony. Did the case proceed under felony murder rule or any instructions on the felony murder rule? No, it wasn't a felony murder. It was just that he was tried as a shooter and it was just a gang-related shooting. It was a rival gang member that was shot. So, you know, I think it's, we've got, the ballistics were such that there was more than one shooter. There were, you know, casings found in, I think, three different places. And none of it came back to his gun. Fill in some of the blanks on the procedural aspects of this case. There was a trial. He was convicted. It went up on appeal. The conviction was affirmed? Yes, the conviction was affirmed on appeal. And the court of appeals, it sometimes does, says, well, you know, ineffective assistance of counsel is better decided on habeas. Right. So. So what happened from that point? Appointed counsel came back and did habeas with a declaration from trial counsel. Starting where? Starting where? In the court of appeal. In the court of appeals. Right. Not the trial court. Right. Because it wasn't really an evidentiary issue at this point, although I suppose it could have been. I think I later, when I asked for an evidentiary hearing. But what the court of appeal actually then said was, okay, you know, presented on habeas. They did with the declaration of trial counsel, which is unusual. You get such a detailed declaration. And then they said, oh, well, he's not telling the truth. He must have had a tactical reason. That's what I was, if there had been an evidentiary hearing and a finder of fact had listened to all of this, for example, testimony, and said, I don't believe what he just said. I mean, that might be a little different than just trying to say on the basis of a piece of paper, I don't believe. That would be very different, Your Honor. It's not really fair to counsel who comes and does a declaration. If there's something ambiguous in here, he should have been cross-examined on it, and then a judge should have made a determination that he was, you know, doing hindsight or Monday morning quarterbacking. But no one ever did that. So he had no chance to ever correct or clarify anything that he said in his declaration, even though I think it's pretty straightforward. He says I made a mistake. And his actions point that out. He talks about he should have made the objection to preserve the point on appeal. The point on appeal that he's referring to is the right to confrontation, which he waived. And that's the essence of the IAC claim. I mean, yes, he should have made an objection to the witness's testimony to preserve the right to confrontation issue. But the IAC issue is because he didn't. Help me understand California and habeas procedure. I know that habeas petitions in California can be filed in the first instance in any court, Superior Court of Appeal, even the Supreme Court. What happens if the first State habeas petition is filed in the Court of Appeal, and the Court of Appeal says, you know, this is hard for us for the same reason it was hard for the Court on direct review, because we'd like some real evidence. What do they do? It happens to me all the time, not as often as I would like, but it does happen where they all send it back to either a pointer referee, which is one option, or else they'll send it back to the trial court if the trial judge is still available or to any Superior Court judge. Sometimes they'll send it to the presiding judge. But they are willing to take evidence, even though it's filed directly in the Court of Appeal, in the sense of documents like this affidavit? Yes, they could have done that if they chose to, yeah. But the reason that this had to be filed in the Court of Appeal is because they invited it, you know. I saw that. I mean, I thought this was just curious that somebody hadn't dug in and made it findings of fact in the normal way. Well, it's sort of, I mean, to me it's sort of uncontroverted, but, I mean, the dissenting judge had no problem deciding it. So, I mean, it was. So they're empowered to make findings of fact also, I suppose. Well, they're not supposed to take evidence. They don't take evidence, but when the evidence is right there and it's uncontroverted. So they looked at it and they said it doesn't square with what we see happened. And so that's what they did. That's what they did. You're saying that's objectively unreasonable. Well, not just me saying it. The district court seemed to think so, too. And I think it's objectively unreasonable in light of the record. The record just is not consistent. They're extrapolating things from the record that are just not even conceivable. Help me understand a little more to the extent that you can, not the question as to how likely it is that Mr. Wilberger would have taken the oath if pressed. I think I've got whatever evidence there is on the point. There's not much. Help me understand how strong or weak the evidence was in the absence of his testimony. There is hardly any evidence at all that my client even had a gun with him, you know, that night, or that he was in the room. Well, I understand that. But come on. You've got some evidence from Williams. She says, he motioned me out of the way. I'm running away, and I hear shots. I can't tell necessarily where they're coming from, but I hear shots. She says, afterwards, I get phone calls from his friends, who basically tell me that he's listening and he's watching. She says, I'm sure he was the shooter, even though I didn't see it. So we've got some evidence. Now, help me understand why, from your perspective, that evidence isn't strong enough for the purposes of determining prejudice under Strickland. Because there's no eyewitness that actually saw him shoot anybody. There's no one that saw him with a gun. There's a whole bunch of other guys there with guns, obviously. And is the evidence, as was just described, that there are a lot of shell casings that were found, more or less, where he was standing? Where she saw him standing at one point? At the point where he waves her away. Because she runs away, and she says, the shooting started almost immediately. Well, while she was running. Is it true that there are shell casings of 9 millimeters found, more or less, where he was standing? More or less in that vicinity, but not exactly where he was standing. There was a whole line of cars, is the way I read it. A whole line of cars and people all standing around there. Any one of whom could have been shooting. Okay. In fact, if he was shooting, I mean, it would have been with his gun. And is it true that there was testimony that her brother was one of the shooters, Williams' brother? That was put on by the defense, that Williams might have had a motive to, you know, to try to protect her brother, which was fairly powerful. He was probably one of the shooters, according to the defense witness. And did the prosecution put any evidence to the contrary on that point? No. So we have some evidence that she might have been lying to protect her brother. There is some evidence of that, yes. I did notice in the police interview that she's asked about the brother, and she says, oh, no, he had nothing to do with it. Yes, that's true. But she wouldn't say that, it was her brother. Well, that's what I mean. That's what I'm trying to figure out, right? I'm trying to figure out how substantial that point would be in undermining her testimony that, well, I know he did it, even though I didn't see it. Yes, I can't see how we could say that it isn't reasonably probable that he would have done better. I mean, it was different standard, I mean, you know. I've got the sense of the evidence. What is the status of the defendant now in terms of custody or non-custody? He's in custody. He's been in custody since he was arrested, I think, a week or two after this incident. He's serving 90 years to life – 80 years to life. You have to speak up. He's serving 80 years to life. He's presently – I think he might be in county jail right now because they're really uptight about the timing. But he was in Lancaster as of a couple of weeks ago. Anything further? No. May I submit, then? Thank you. Would you like – let's put two minutes on the clock. Sort of a housekeeping thing. My excerpt of record filed by your office doesn't have an ER-41 in it, which is a page of the court of appeals opinion. Do you have an extra page four of the court of appeals decision? Excerpt of record, page 41? Yeah, I don't have a 41. Yeah. Nor I. Nobody does. I do. Would you like it? Yes. The missing document. Just to respond to a few points, trial counsel did have a tactical basis to cross-examine. Sure, Wilberger said no, he didn't – he wasn't there, he didn't see anything. But trial counsel explained in his declaration that because of the evasive demeanor, that he felt he needed to cross-examine him because the jury would think that he was hiding evidence. And so as the California court of appeals found, he elected to hammer home the most favorable points of Wilberger's testimony, which was I've never seen a petitioner before in my life and I didn't see him the day of the shooting. To the extent that there's no evidence that the prosecutor – or there's evidence the prosecutor – And at that point, had we already had the impeaching evidence brought in by the prosecutor, impeaching of their own witness? At the time for the cross-examination? No. Yeah. When the cross-examination starts. No. It occurred – the prior statement was admitted the next day. And on what basis was it admitted? Was it admitted in any way because of the questioning by the defense lawyer? That's exactly correct. The trial court found that trial counsel had weighed any objection to the unsworn testimony and therefore there was testimony to impeach. So in other words, we have another ineffective performance. So there are two – he makes two mistakes, either one of which if he had avoided that impeaching stuff wouldn't have come in. Well, again, I think that it was a tactical decision to hammer home the most favorable points of the testimony in the cross-examination. On that point, I guess we're saying that he says he had a tactical – Correct. Yeah. In his declaration. Yeah. I see that my time is almost up, but if I can just quickly sum up. William said that she knew that Prentiss did it. She said, I didn't see him do it, but I know he did it. Why was he moving me out of the way? That's hearsay, right? Hearsay is her statement. Yeah, but how did she know it? She said she knew he did it. Why did he move me out of the way? Well, I mean – I know he did it. Well, that's her – she's surmising certain things. Sure. She's making a conclusion based on the things that happened that day. I mean, he might have – for example, he might have seen somebody ready to shoot and he says, out of the way. Well, of course, that's belied by the ballistics evidence, but that's a possibility. Right. But she – that's not what she said to detectives. What she said to detectives is, I know that he did it. And, again, just the California Court of Appeals factual findings were reasonable and, therefore, its opinion was entitled to deference under AEDPA. And the district court erred in concluding otherwise. Thank you. Thank you, counsel. Thanks very much. This last case, Griffin v. Harrington, now submitted for decision. And that completes our argument calendar for this morning. Thank you. All rise for the presentation of the jury. Thank you.
judges: Trott, Lucero, Fletcher